## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 12 2015, 6:24 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Ryan W. Tanselle
Capper Tulley & Reimondo
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jerry Austin,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

November 12, 2015

Court of Appeals Case No.
32A01-1504-CR-143

Appeal from the Hendricks
Superior Court

The Honorable Karen M. Love,
Judge

Trial Court Cause No.
32D03-1404-CM-290

**Kirsch, Judge.**

Following a jury trial, Jerry Austin appeals his convictions for Class A misdemeanor resisting law enforcement[1] and Class B misdemeanor disorderly conduct.[2] He raises two issues that we restate as:

> I. Whether the State presented sufficient evidence to support his convictions for resisting law enforcement and disorderly conduct; and
>
> II. Whether Austin's sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

## Facts and Procedural History

In the early morning hours of March 27, 2014, Austin called IU Health West Hospital ("Hospital") in Avon, Indiana. He spoke to the emergency room ("ER") charge nurse, Natalie Burgess ("Burgess") and complained of neck pain, telling her that he had taken Valium, but was not getting relief from the pain. Austin wanted to get to the Hospital, but did not want to drive, as he had taken Valium and the brakes on his vehicle were not operating properly. Burgess encouraged him to come to the Hospital so that he could be evaluated, and she offered the suggestion that he could call 911 or that a family member could

---

[1] *See* Ind. Code § 35-44.1-3-1(a)(1). We note that, effective July 1, 2014, the Indiana General Assembly enacted a new version of each of the criminal statutes under which Austin was charged. Because he committed the offenses prior to that date, we apply the statutes in effect at that time.

[2] *See* Ind. Code § 35-45-1-3(a)(2).

bring him to the ER. Austin was agitated and "argued with [her] back and forth on the phone about how he was gonna get to the emergency department." *Tr*. at 108. Eventually, Austin called 911, and an ambulance brought him to the ER.

[4] Upon his arrival, he was "oriented" and "awake, alert, and talking." *Id*. at 109, 202. He was able to meet with Hospital personnel, including Burgess and EMT/Tech Andrew Hurst ("Hurst"), and describe the neck pain that brought him to the Hospital. Austin requested a specific narcotic pain medication, but the attending physician denied it, instead offering him Toradol, a non-narcotic pain medication administered through an I.V. line. Austin refused it, saying that it had not helped in the past, and he "didn't want that f*cking medicine." *Id*. at 110. He became angry, "ripped out his I.V.," and threatened to go home and consume more pain medication, telling staff, "I'll finish what I've started." *Id*. at 111, 205; *see also id*. at 215, 216-17 (telling ER physician that he would "go home and take two hundred and fifty Vicodin and end it himself.") Hospital staff considered Austin to be a suicidal patient, and his assigned ER room had a closed-circuit camera so that the nurses could view him from the nurses' station.

[5] After being denied the narcotic medication, Austin became increasingly angry and combative while in the ER. He yelled and screamed and used profanity. At some point, Burgess called for Hospital security to come and assist with the situation. Two Hospital security officers arrived, including Johnny Williams ("Williams"). Austin threatened to fight the security officers and continued

yelling profanities, "C'mon mother f*ckers, I'll take you on, I'll take you on, c'mon." *Id*. at 139. Security officers were able to calm Austin and left the ER, but were called back when the behavior resumed.

[6] Shortly before 6:00 a.m., the charge nurse for the next shift arrived to replace Burgess, and upon viewing the situation, she called 911. Officer Chase Wilson of the Danville Police Department was on his way to work when he heard the radio dispatch and responded to the call.[3] Austin was in his ER room, and Hurst was in the room with him. Although Austin's door was closed, the interior could be seen, and was being viewed by the staff, via live feed on the television. Williams opened the door to Austin's room, and when Austin saw Officer Wilson, he immediately became more upset and angry, stating, "Great, the police are here, now I can fight." *Tr*. at 155, 165. Officer Wilson directed Hurst to step out of the room.

[7] Officer Wilson tried several times to verbally de-escalate the situation, telling Austin to calm down so they could talk. Officer Wilson directed Austin to turn and face the wall and place his hands behind his back, to be handcuffed, but he refused. Austin grabbed his aluminum cane, waved it in the air, and began coming toward Officer Wilson with the cane "in an aggressive manner[.]" *Id*. at 157. Officer Wilson, who was approximately ten feet from Austin,

---

[3] The town of Avon, where IU Health West is located, has its own police department. Even though Officer Wilson worked for the Danville Police Department, he responded to the radio dispatch because he was directly in front of the Hospital when he heard the call.

continued to order Austin to stop, turn around and put his hands behind his back, but Austin refused to comply. Throughout this entire encounter, Austin was yelling statements indicating that he "had no problem fighting the cops." *Id.* Officer Wilson warned Austin that, if he did not stop, the officer would use his Taser on Austin.

[8]     Officer Wilson deployed his Taser, but the probes did not engage properly, such that its use resulted in "pain compliance," but did not result in the intended total muscle lock-up, and Austin "continued to fight." *Id.* at 159-60. After being hit with the Taser, Austin tried to get up from the ground and would not place his hands behind his back. Officer Wilson, Williams, Hurst, and two other security officers were in the room and attempting to restrain Austin, who continued to be combative and unwilling to comply with Officer Wilson's commands. The Taser was used as a "drive stun" three more times before the men were able to restrain Austin and place him in the Hospital bed. *Id.* at 185. The Hospital kept Austin for initial observation, and later, he was transferred to Methodist Hospital in Indianapolis pursuant to an immediate detention order.

[9]     The State charged Austin with resisting law enforcement as a Class A misdemeanor and disorderly conduct as a Class B misdemeanor. At Austin's request, a jury trial was held. Evidence was presented that Austin reported to staff that he had consumed, during the course of the day, 20-30 Valium, which Burgess described as a sedative and muscle relaxer. Burgess testified that, upon arriving at the ER, Austin was agitated, but "wide awake, alert" and able to comprehend, answer questions, and provide medical history and he did not

exhibit signs of having consumed that amount of Valium. *Id*. at 131. EMT/Tech Hurst, who was one of the first Hospital staff to meet and converse with Austin, testified that Austin "was alert and oriented," knew where he was, and was able to provide "detailed" medical history and current complaints. *Id*. at 202-03. Hurst testified, "In my opinion, he was not under the influence of a significant amount of Valium. He was [] coherent. He was alert. He was oriented." *Id*. at 219. However, both Burgess and Hurst testified that Austin was frustrated about being denied the narcotic pain medication, making statements such as, "This place is f*ckin' stupid. I just, I want my f*ckin' pain under control. I can go home and finish taking care of this myself if you guys aren't going to help me." *Id*. at 112.

[10] Hospital security guard Williams testified that Austin was combative and swinging his cane, yelling that "he wasn't afraid of us" and "he could take us on[.]" *Id*. at 139. Williams testified, "All he wanted to do was [] fight." *Id*. at 140. Williams estimated that he was first in contact with Austin at around 2:00 a.m., and he estimated that, as he walked toward the ER, he could hear Austin yelling and cursing from about fifty feet away. The 911 call was played for the jury, in which the incoming charge nurse for the next shift spoke to dispatch: "I've got [] a suicidal patient that's threatening to leave and I've got both of my security guards in here and I need some back up before he leaves. He's agitated. . . . My two security guards are asking for help because it's escalating as we speak." *Id*. at 114-15. Burgess recalled that Austin was yelling at Officer

Wilson and security staff, "You can't f*ckin' take me down" and similar statements of that nature. *Id*. at 118.

[11]   EMT Hurst said "as the night went on," Austin became more belligerent and aggressive, threatening staff and police officers. He was loud and argumentative "about absolutely everything." *Id*. at 205. At one point, Austin put on his gloves "that he said were for beating people's ass." *Id*. When Austin saw Officer Wilson standing at his room door, he became "enraged" and "ready to fight." *Id*. at 209-10. Hurst said that, at one point, Austin "charge[d]" at Officer Wilson with the cane. *Id*. at 210. Officer Wilson testified as to the dispatch call, and he described the events leading up to his use of the Taser. He also explained that he used the Taser, as opposed to pepper spray, to subdue Austin because he was in a hospital setting, and pepper spray "would contaminate the entire emergency room" and other patients could have been affected. *Id*. at 193. Hurst, along with Burgess, testified that Austin was disruptive to Hospital operations because he was yelling and using profanity, and Hospital staff had to expend extra time and resources to supervise him, which reduced staff available to other patients, some of whom complained about Austin's behavior and said they "didn't feel safe." *Id*. at 208.

[12]   Austin was found guilty as charged of Class A misdemeanor resisting law enforcement and Class B misdemeanor disorderly conduct. The trial court sentenced him to an aggregate term of one year in the county jail, reduced by time served and good time credit, with the remainder suspended to probation. Austin now appeals.

# Discussion and Decision

## I. Sufficiency of Evidence

[13] Austin claims that the evidence was not sufficient to convict him of resisting law enforcement and disorderly conduct. When reviewing the sufficiency of the evidence to support a conviction, we do not reweigh evidence or reassess the credibility of witnesses. *Walker v. State*, 998 N.E.2d 724, 726 (Ind. 2013). "We view all evidence and reasonable inferences drawn therefrom in a light most favorable to the conviction, and will affirm 'if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *Id*. (quoting *Davis v. State,* 813 N.E.2d 1176, 1178 (Ind. 2004)).

[14] To prove Class A misdemeanor resisting law enforcement as charged, the State was required to prove that Austin knowingly and forcibly resisted, obstructed, or interfered with an officer while said officer was lawfully engaged in the execution of his duties as a law enforcement officer. *See* Ind. Code § 35-44.1-3-1(a)(1); *Appellant's App*. at 13. To prove Class B disorderly conduct as charged, the State was required to prove that Austin recklessly made unreasonable noise after being asked to stop. *See* Ind. Code § 35-45-1-3(a)(2). Specifically, the State charged that Austin, "did recklessly make unreasonable noise, to wit: yelling at [a] level that [a]ffected hospital operations; and continued to do so after being asked to stop" by Hospital staff and Officer Wilson. *Appellant's App*. at 14.

## A. Involuntary Intoxication

[15] Austin claims that the evidence was not sufficient to convict him of resisting law enforcement and disorderly conduct because he was involuntarily intoxicated at the time of the offenses. The State charged Austin with resisting law enforcement by "knowingly" forcibly resisting, obstructing, or interfering with Officer Wilson's duties. *Id*. at 13. "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." Ind. Code § 35-41-2-2(b). The State charged Austin with committing disorderly conduct by "recklessly" making unreasonable noise and continuing to do so after being asked by Hospital staff and Officer Wilson to stop. *Appellant's App*. at 14. "A person engages in conduct 'recklessly' if he engages in conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." Ind. Code § 35-41-2-2(c). On appeal, Austin claims that he was involuntarily intoxicated by virtue of a possible Valium overdose and, therefore, was not able to form the requisite mens rea.

[16] Indiana Code section 35-41-2-5 provides that intoxication is not a defense to prosecution unless the defendant meets the requirements of Indiana Code section 35-41-3-5, which provides:

> It is a defense that the person who engaged in the prohibited conduct did so while he was intoxicated, only if the intoxication resulted from the introduction of a substance into his body:

(1) Without his consent;

(2) When he did not know that the substance might cause intoxication.

Our Supreme Court has held, "Indiana Code section 35-41-2-5 reflects the legislative determination that defendants who are voluntarily intoxicated are responsible for their resulting actions, but recognizes that individuals who become intoxicated through no fault of their own are not to be held responsible for actions taken while intoxicated." *Sanchez v. State*, 749 N.E.2d 509, 522 (Ind. 2001). That is, "intoxication is a defense only if the defendant did not consent to the introduction of the substance into his body or if the defendant was unaware the substance might cause intoxication." *Davidson v. State*, 849 N.E.2d 591, 594 (Ind. 2006). When a defendant raises the intoxication defense, the State bears the burden of negating the defense in relation to the mens rea of the offense. *Bassie v. State*, 726 N.E.2d 242, 243-44 (Ind. 2000). Whether a defendant was so intoxicated that he could not form the mens rea required for the crime is a question for the trier of fact. *Id.* at 244.

[17] Initially, we observe that the record shows Austin did not raise the defense of intoxication at trial. In fact, when the State requested that the court include a voluntary intoxication instruction, *i.e.* voluntary intoxication is not a defense, Austin's counsel objected, arguing that intoxication was not an issue:

> We don't have any medical records. We have no idea what [Austin] was under the influence [of] at that time and if you read the legal definition of intoxication, it states that your faculties

and your mind both have to be [] at issue. Every single one of the State's witnesses has said that he's alert, he's awake, he's coherent. He knows where he is. He knows what's going on. So how can [the State] now say that he's intoxicated[.]

*Tr*. at 224. The State responded that the defense "brought on" the issue of intoxication by asking on cross-examination about Austin having taken 20-30 Valium. *Id*. at 225. Counsel for Austin replied that "the issue for the defense is the suicide not the intoxication level." *Id*. Based on the record before us, we find that Austin did not preserve any claim regarding involuntary intoxication at trial; indeed, he took the position that intoxication was not at issue, and thus the issue is waived on appeal.[4] *Orta v. State*, 940 N.E.2d 370, 376 (Ind. Ct. App. 2011) (failure to raise issue at trial waives issue for appeal), *trans. denied*.

[18]     Waiver aside, we reject Austin's claim that he was involuntarily intoxicated and unable to form the requisite mens rea for the crimes. Austin told Hospital staff that he had taken 20-30 Valium, but both Burgess and EMT Hurst testified that Austin was awake, alert, oriented, and able to speak with staff. He described his pain and asked for a specific narcotic drug by name, which the attending physician denied. Burgess and Hurst both opined that Austin's condition and behavior was not consistent with someone who had taken 20-30 Valium. Upon

---

[4] The trial court granted the State's request for a voluntary intoxication instruction, which decision Austin does not challenge on appeal. The instruction read in part: "Voluntary intoxication is not a defense to a charge of Resisting Law Enforcement and/or Disorderly Conduct. You may not take voluntary intoxication into consideration in determining whether the Defendant acted knowingly and/or recklessly[.]" *Appellant's App*. at 155.

being denied the requested narcotic, Austin made threats to leave the ER, go home, and consume large quantities of Vicodin, and this caused staff to be concerned about a possible overdose situation, particularly given that Austin reported having consumed Valium already. This concern about a possible overdose situation, however, does not establish or even indicate that Austin was intoxicated while at the ER.

[19] Moreover, even if Austin was intoxicated, any intoxication was not shown to be involuntary. On appeal, Austin argues that "he was unaware that his consumption of Valium would cause him to be intoxicated." *Appellant's Br*. at 8. The record does not support that position, however. Burgess testified that, during Austin's early morning phone call when he stated that he wanted to get to the ER, "He proceeded to tell me how *he had taken all of his Valium so he couldn't drive* and his truck didn't have any brakes[.]" *Tr*. at 107 (emphasis added). Austin "felt it wasn't a good idea" for him to drive, and he did not know how to get to the ER, so Burgess "gave him the options" of calling 911 or having a neighbor bring him to the Hospital. *Id*. Burgess's testimony indicates that Austin was aware that, because he had taken Valium, he should not drive. Given the record before us, Austin has failed to persuade us that he was involuntarily intoxicated and unable to form the requisite mens rea. *See Alfrey v. State*, 960 N.E.2d 229, 234 (Ind. Ct. App. 2012) (rejecting defendant's challenge to sufficiency of evidence that was based on his claim that his mens rea was lacking because of prescription medication intoxication), *trans. denied*.

## B. Excessive Force

Austin claims that, because Officer Wilson used excessive force, he was not lawfully engaged in the execution of his duties, and, therefore, insufficient evidence was presented to convict him of resisting law enforcement. It is well-settled that police have a legal right to take reasonable steps to stabilize a situation during the course of their investigation for both the safety of the officers as well as the citizens present. *Perez v. State,* 981 N.E.2d 1242, 1249 (Ind. Ct. App. 2013), *trans. denied.* This includes placing an individual in handcuffs to enable the officers to conduct their investigation and to ensure their own safety or the safety of others. *Id.* A citizen may not use force to resist a peaceful arrest by an individual he knows, or has reason to know, is a police officer performing his duties regardless of whether the arrest in question is lawful. *Robinson v. State*, 814 N.E.2d 704, 708 (Ind. Ct. App. 2004). However, when an officer uses unconstitutionally excessive force in effecting an arrest, that officer is no longer lawfully engaged in the execution of his or her official duty. *Patterson v. State*, 11 N.E.3d 1036, 1039 (Ind. Ct. App. 2014).

As Austin recognizes, claims of excessive force by law enforcement "are analyzed under the Fourth Amendment [] and its reasonableness standard." *Appellant's Br*. at 10; *see also Patterson*, 11 N.E.3d at 1039.

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. However, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are

"objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

*Patterson*, 11 N.E.3d at 1039-40 (citations omitted).

[22] Here, Hospital staff called 911 because Austin was profane and combative and security guards needed assistance. Upon seeing Officer Wilson, Austin yelled that he was ready to fight, and he grabbed his cane and waved it at Officer Wilson. Austin refused Officer Wilson's requests to calm down so they could talk. Officer Wilson directed Austin several times to turn around and place his hands behind his back to be handcuffed, and again, Austin refused the commands. Officer Wilson testified that he was concerned not only for his own safety, but also for the safety of Hospital staff and other ER patients. Officer Wilson did not use the Taser on Austin until Austin began coming toward the officer in an aggressive manner, with his cane, which Officer Wilson considered at that point to be a weapon. Before deploying the Taser, Officer Wilson warned Austin that he would use it if Austin continued to fail to cooperate. Austin "proceeded to charge" at Officer Wilson with the cane, closing the space between them from about ten feet to three, at which time Officer Wilson deployed the Taser. *Tr.* at 210. However, it did not engage properly, administering only some "pain compliance," but not muscle lock up, and Austin got up and continued to come toward Officer Wilson. *Id.* at 159.

[23] Officer Wilson and Hospital staff – a total of five men – then entered Austin's room and tried to subdue him, but he pulled away and refused to be

handcuffed. Officer Wilson stunned Austin with the Taser three more times, and eventually, Officer Wilson and the others were able to gain control of Austin and placed him on the bed. Officer Wilson chose to use the Taser instead of pepper spray "because [pepper spray] would contaminate the entire emergency room," and it could have affected other patients in the ER, especially if they had respiratory issues. *Id*. at 193. Given the facts and circumstances that Officer Wilson faced, we find that his actions were objectively reasonable, and the force he used was not excessive. *See Patterson*, 11 N.E.3d at 1040 (officer's force not excessive where officer struck defendant's face with his hand and also considered using Taser during physical struggle with defendant, who pushed back, yelled in officers' faces, and wrestled with them). Based on the record before us, we find that Officer Wilson lawfully detained Austin in order to stabilize the situation, and the State presented sufficient evidence to convict Austin of resisting law enforcement.

## II. Sentencing

[24] The trial court sentenced Austin to an aggregate term of one year in the county jail, reduced by time served and good time credit, with the remainder suspended to probation. Austin argues that his sentence is inappropriate under Indiana Appellate Rule 7(B). He requests that we reduce the length of his suspended sentence and probation.

[25] Appellate Rule 7(B) provides that we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offenses and the character

of the offender. A defendant bears the burden of showing that both prongs of the inquiry favor revision of his or her sentence. *Anderson v. State*, 989 N.E.2d 823, 827 (Ind. Ct. App. 2013), *trans. denied*. We understand and recognize the unique perspective a trial court brings to its sentencing decisions. *Rutherford v. State,* 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). The trial court's judgment "should receive considerable deference." *Cardwell v. State,* 895 N.E.2d 1219, 1222 (Ind. 2008). A defendant must persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[26] The maximum sentence for a Class A misdemeanor is one year of incarceration, and the maximum sentence for a Class B misdemeanor is one hundred and eighty days. Ind. Code §§ 35-50-3-2, -3. On the Class A resisting law enforcement conviction, the trial court imposed a sentence of one year in the county jail, but gave Austin credit for time served plus good time credit and suspended the remaining 351 days to probation. For the Class B misdemeanor disorderly conduct conviction, the trial court sentenced Austin to two days in the county jail, but credited Austin with two days of time served. The trial court imposed some "special conditions" of probation, including evaluation and completion of a substance abuse program, mental health evaluation and completion of treatment if recommended, providing a list of prescribed medications to probation officer, and anger control counseling. *Tr*. at 272.

[27] As for the nature of the offense, Austin argues that his culpability was low given that he was suffering from a potential Valium overdose, induced by his desire to relieve his neck pain. Austin also observes that no one was hurt. While

fortunately no one was hurt, Austin caused disruptions in the ER for hours. He was loud, profane, combative, and belligerent. He scared other patients, and he monopolized Hospital resources, namely staff that had to attend to him, making fewer staff available to other patients. He repeatedly threatened to fight security and Officer Wilson. Turning to Austin's character, he argues that he is a person of "good character," and a downward revision is warranted. *Appellant's Br*. at 13. The record shows that he has one disorderly conviction from sometime in the 1990s, but otherwise has no criminal history.

[28] The question before us is not whether another sentence is more appropriate; instead, the question is whether the sentence imposed is inappropriate. *Marley v. State*, 17 N.E.3d 335, 339 (Ind. Ct. App. 2014), *trans. denied*. Indiana's sentencing scheme allows trial courts to tailor appropriate sentences to particular circumstances. *Cardwell*, 895 N.E.2d at 1224. We cannot say that the trial court's imposition of a suspended sentence and probation, which included a number of conditions specifically tailored to Austin, was inappropriate.

[29] Affirmed.

Najam, J., and Barnes, J., concur.